**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANT:

**RUTH JOHNSON**
**CHRIS P. FRAZIER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHELLE BUMGARNER**
Deputy Attorney General
Indianapolis, Indiana

FILED
Apr 18 2013, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEVANTE LANCASTER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1208-CR-635 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Robert R. Altice, Judge
Cause No. 49G02-1105-FB-31012

**April 18, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Jevante Lancaster ("Lancaster") appeals from the trial court's revocation of his probation and Marion County Community Corrections placement, which was imposed following his guilty plea to Class B felony burglary.[1] He raises the following restated issue: whether the State presented sufficient evidence to prove by a preponderance of the evidence that Lancaster violated his probation.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On May 5, 2011, Lancaster was charged with Class B felony burglary, Class D felony auto theft, and Class D felony resisting law enforcement. Under the terms of a July 2011 agreement, Lancaster pleaded guilty to the burglary charge, and in exchange for his plea, the State dismissed the remaining two counts. In August 2011, the trial court sentenced him to six years of executed time to be served in the Marion County Community Corrections ("Community Corrections") program at a location deemed appropriate by that agency. The order also required Lancaster to comply with the following Special Conditions during his commitment to Community Corrections: (1) take parenting classes; (2) obtain a general educational development diploma ("GED"); (3) establish paternity; and (4) pay restitution. It appears that initially Lancaster was placed on work release at Duvall Residential Center ("Duvall") and then was placed on home detention from fall 2011 to early 2012.

On January 3, 2012, the State filed a notice of Community Corrections violation ("Violation 1"), alleging that on two occasions Lancaster had left his residence without being

---

[1] *See* Ind. Code § 35-43-2-1.

scheduled to do so, was arrested and charged with two new felonies, and failed to comply with the monetary obligations. A month later, the trial court held a hearing, and Lancaster admitted to Violation 1. The trial court sentenced him to the original six-year sentence, but returned him to placement in work release, and again ordered him to complete parenting classes, obtain his GED, establish paternity, and pay restitution. *Appellant's App.* at 42. The order also stated, "The defendant is to comply with all rules, regulations, treatment recommendations, procedures, and pay all fees of Community Corrections[.]" *Id.*

On July 6, 2012, the State filed a second notice of Community Corrections violation ("Violation 2"), asserting that Lancaster failed to comply with the court-ordered GED classes, that he violated the rules of Duvall, and that he failed to comply with his monetary obligations.

At the hearing on Violation 2, the State presented the testimony of Alison Shine ("Shine"), who was a "court team" employee with Community Corrections. *Tr.* at 6. Shine explained that her entire job was to attend hearings on probation violations in the Marion County criminal courts and testify regarding those matters. Shine testified that Lancaster, who she did not know personally, was originally placed at Duvall on August 12, 2011, and as part of his placement there, he signed "conditions of placement," which outlined rules and expectations. *Tr.* at 9-10. He was moved to home detention from October 12, 2011 to January 1, 2012. However, he was arrested on two felonies and convicted of Class D felony battery such that he was sent back to Duvall, arriving on March 8, 2012. Shine testified that as of July 3, 2012, or approximately 120 days after his placement at Duvall, he had missed

ten court-ordered GED classes, failed to secure any employment or pay anything toward his fees, and received twelve conduct reports for various violations, including "abusing an order," "violating conditions of a pass," "violating a facility rule," and "possession of an electronic device." *Id.* at 14-15. Lancaster was "let out to job search," and was required to bring back verification of where he had applied for work, but he failed to provide any documentation or verification. *Id.* at 17. There had been various internal meetings regarding the violations, attended by Lancaster, his case manager, Duvall's director of security, and a Community Corrections representative, and ultimately it was decided the internal meetings were not improving Lancaster's compliance with Duvall's rules; therefore, Community Corrections notified the State and filed the notice of probation violation in court.

Lancaster also testified at the probation revocation hearing. He stated that he had been attending GED classes every day at another location called "Fathers and Famil[ies] Center." *Tr.* at 21. Regarding the GED classes at Duvall, he explained, "As [far] as I was concerned, . . . I didn't have to take classes at Duvall as long as I was taking them at Fathers and Famil[ies]." *Id.* at 21-22. He said that he attended those classes daily "from 8:00 to probably about . . . 3:00 or 4:00." *Id.* at 21. Lancaster attended an administrative hearing at Duvall on June 15, 2012, at which he was specifically instructed that he was required to take GED classes in-house, at Duvall. The GED next class offered after that meeting was June 26, and Lancaster did not attend it.

Regarding employment, Lancaster reported, "I actually just got employed with [Unistaff]" in early June 2012, and he said he tried to tell his case worker about the

4

employment but "she refused to meet with me." *Id*. at 22. With regard to his failure to provide documentation of job searches, he said, "I do my application on line and I go and do follow-ups." *Id*. at 26.

When asked by the State about the twelve conduct violations to which Shine had testified, including a number of them concerning missing "count," which appears to be a method of taking attendance, Lancaster replied he did not know how all the "missed count" violations occurred because "I'm in my bunk all the time[.]" *Id*. at 23. He also testified concerning a separate conduct violation in which he refused to remove a beanie stocking hat, explaining that he was told to remove it but he wanted to wear it to sleep. Lancaster acknowledged that he appeared before the "DHB," or the Disciplinary Hearing Board, on two occasions: one concerning his refusal to clean up outside, which was dismissed, and another for not attending Duvall's GED classes. *Id*.

The trial court revoked Lancaster's probation and placement in Community Corrections and ordered him to serve the remainder of his sentence at the Department of Correction. He now appeals.

**DISCUSSION AND DECISION**

Lancaster asserts that Shine's testimony lacked reliability and that the trial court erred in failing to assess the trustworthiness of her testimony. We begin with the premise that "[p]robation is a matter of grace left to trial court discretion, not a right to which a criminal defendant is entitled." *Prewitt v. State,* 878 N.E.2d 184, 188 (Ind. 2007)). Accordingly, probationers do not receive the same constitutional rights that defendants receive at trial.

5

*Reyes v. State*, 868 N.E.2d 438, 440 (Ind. 2007). The due process right applicable in probation revocation hearings allows for procedures that are more flexible than in a criminal prosecution. *Id.* Indeed, Indiana Evidence Rule 101(c) provides that the Indiana Rules of Evidence do not apply in probation proceedings. As such, "courts may admit evidence during probation revocation hearings that would not be permitted in a full-blown criminal trial." *Carden v. State*, 873 N.E.2d 160, 163 (Ind. Ct. App. 2007). "[C]ourts in probation revocation hearings may consider any relevant evidence bearing some substantial indicia of reliability. This includes reliable hearsay." *Cox v. State*, 706 N.E.2d 547, 551 (Ind. 1999). It is within the discretion of the trial court to determine the conditions of a defendant's probation and to revoke probation if the conditions are violated. *Prewitt*, 878 N.E.2d at 188. In a sense, all probation requires "strict compliance" because probation is a matter of grace, and once the trial court extends this grace and sets its terms and conditions, the probationer is expected to comply with them strictly. *Woods v. State*, 892 N.E.2d 637, 641 (Ind. 2008). If the probationer fails to do so, then a violation has occurred. *Id.* But even in the face of a probation violation, the trial court may nonetheless exercise its discretion in deciding whether to revoke probation. *Id.* (citing *Clark Cnty. Council v. Donahue,* 873 N.E.2d 1038, 1039 (Ind. 2007) ("The probationary scheme is deliberately designed to give trial judges the flexibility to make quick, case-by-case determinations.").

For purposes of appellate review, a hearing on a petition to revoke a placement in a community corrections program is treated the same as a hearing on a petition to revoke probation. *Cox*, 706 N.E.2d at 549. Probation and community corrections programs serve as

alternates to commitment to the Department of Correction, and both are made at the sole discretion of the trial court. *Id.* Violation determinations and sanctions are reviewed for abuse of discretion. *Woods*, 892 N.E.2d at 639-40. An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances, or when the trial court misinterprets the law. *Id.* We consider only the evidence most favorable to the judgment without reweighing that evidence or judging the credibility of the witnesses. *Id.* at 639-40 (citing *Braxton v. State,* 651 N.E.2d 268, 270 (Ind. 1995)). If there is substantial evidence of probative value to support the trial court's decision that a defendant has violated any terms of probation, the reviewing court will affirm its decision to revoke probation. *Id.* at 640.

Probation revocation is a two-step process. First, the trial court must make a factual determination that a violation of a condition of probation actually occurred. *Beeler v. State,* 959 N.E.2d 828, 829-30 (Ind. Ct. App. 2011). Second, if a violation is found, then the trial court must determine the appropriate sanctions for the violation. *Id.* Here, the parties' dispute concerns the first step of the two-step process, namely whether a violation of a condition of probation occurred. Lancaster argues that Shrine's testimony was all hearsay and that the trial court erred by allowing it into evidence and, further, by failing "to make any assessment of the weight, sufficiency, and reliability" of her testimony. *Appellant's Br.* at 6. Without her testimony, he claims, there was not sufficient evidence for the trial court to revoke his probation. Lancaster concedes that he failed to raise any objection to Shrine's testimony but, to avoid waiver, claims that the trial court's errors were fundamental and

7

deprived him of his due process rights, and he asks us to reverse the revocation of his placement in Community Corrections.

Fundamental error is error that constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Id.* at 830; *Carden*, 873 N.E.2d at 164. The fundamental error rule applies only when the error constitutes a blatant violation of basic principles, the harm of potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Beeler*, 959 N.E.2d at 830.

Turning to the matter of Shine's testimony, Lancaster asserts that Shine did not know him and had no independent knowledge of his alleged violations, her testimony was completely based on his "file," and her testimony constituted hearsay. *Appellant's Br.* at 9-10. Although the evidentiary rules are relaxed in probation revocation proceedings, "[t]his does not mean that hearsay evidence may be admitted willy-nilly in a probation revocation hearing." *Reyes*, 868 N.E.2d at 440. In *Reyes*, our Supreme Court adopted the "substantial trustworthiness test," in which the trial court evaluates the reliability of the hearsay evidence. *Id.* at 442. Although the *Reyes* court noted that "'ideally [the trial court should explain] on the record why the hearsay [is] reliable and why that reliability [is] substantial enough to supply good cause for not producing ... live witnesses,'" it appears that an express trial court explanation is not necessarily required. *Id.* at 442 (quoting *United States v. Kelley*, 446 F.3d 688, 692 (7th Cir. 2006). That is, in *Reyes*, our Supreme Court noted that the trial court only made reference to the witness's curriculum vitae, and thus "the trial court's explanation on

the record of its decision to admit hearsay is not as detailed as we would prefer"; however, the Supreme Court nevertheless determined that the evidence in the record adequately supported a finding that the witness's affidavits were substantially trustworthy. *Id*. at 442.

Likewise, we find the record in this case adequately supports a finding that Shine's testimony was substantially trustworthy. Shine testified that she worked for Community Corrections, and her sole job was to testify on behalf of that organization in the Marion County Criminal Courts regarding probation violations. As the *Reyes* court recognized,

> [W]e see no reason to require that the State . . . expend its resources to produce a witness (or indeed to require that witness to expend his or her time) to give routine testimony in that routine probation revocation hearing, when a reliable piece of hearsay evidence is available as a substitute.

868 N.E.2d at 441-42. Unlike in *Reyes*, where there was no live witness, and the State offered only an affidavit of the director of a toxicology laboratory, in the present case Shine testified in person, and Lancaster was free to cross-examine her testimony. Although in his brief, Lancaster asserts that "[n]either the State nor the trial court made any inquiry of Shine as to the nature, source, or authorship of the documents she referred to in her testimony," neither did Lancaster's counsel. *Appellant's Br*. at 10. Indeed, because Lancaster did not object, on hearsay grounds or otherwise, or raise any concerns regarding Shine's testimony, the State had no reason or purpose to offer or introduce evidence concerning the reliability of Shine's testimony.

Lancaster urges us to find that, based on *Mateyko v. State*, 901 N.E.2d 554 (Ind. Ct. App. 2009), Shine's testimony was not reliable, and it was error for the trial court to rely on it. While factually-similar in some respects, we find that case is distinguishable and not

controlling of our decision today. In *Mateyko*, Mateyko's therapist told his probation officer that Mateyko had violated rules of his probation, and his probation officer told his supervisor, Fishburn, who testified at the revocation hearing. Noting that Fishburn "was removed by several steps from the events at issue," a panel of this court determined, "[u]nder these facts and circumstances, … Mateyko has at least established *prima facie* error," holding that trial court erred in the admission of Fishburn's testimony. 901 N.E.2d at 557.

*Mateyko* is distinguishable from the facts before us in at least a couple of respects. First, unlike in the present case, defendant's counsel objected to the disputed testimony. Thus, the State had an opportunity to respond, and the trial court had reason to assess the issue of the witness's reliability. Second, the State in *Mateyko* did not file an appellate brief, and therefore, Mateyko only was required to make a *prima facie* showing of error, a lesser burden than Lancaster faces. While relevant to the analysis, *Mateyko* is not on par with Lancaster's case in either fact or context. In contrast to our colleagues' decision about Fishburn, we find that Shine, specifically employed to testify at probation revocation hearings in the Marion County Criminal Courts, presented substantially trustworthy testimony, to which no objection was posed, and we find no fundamental error in the trial court's admission of it.

We next address whether the State presented substantial evidence of probative value to establish that Lancaster had violated his probation. Our review of the record reveals a number of probation violations. First, with regard to his failure to attend the GED classes, even if Lancaster was taking classes elsewhere as he claims, that is nonetheless a violation.

He was required to take his classes at Duvall. Lancaster admits that he attended a Duvall administrative meeting in June 2012 and was expressly told he was required to take his classes at Duvall, yet he failed to attend the very next GED class. The trial court explained that Lancaster's attendance was not optional:

> [T]hey told him to go to class, he goes to class. He's in jail. He's not, you know, at home with his mom telling him to go to class and he's saying, no, I don't feel like it today. The rules there apply to him and if he violates them, he violates them.

*Tr*. at 28-29.

Second, with regard to his failure to obtain employment, Lancaster did not report back to Duvall with information or verification. Even if he completed online applications and did the "follow up" in person, as he testified to doing, Lancaster could have, and was required to, provide documentation to Duvall to reflect his efforts and the status of the job searching. Although Lancaster testified to having gained employment in June 2012 and that his case manager would not speak to him about it, the trial court evaluated his credibility and evidently discredited that testimony, concluding that Lancaster had not secured employment, which is the whole purpose of placement in work release, stating:

> He hasn't had a job, it's 120 days. Work release is for people that want to work and do their schooling and you can do both. And so here we are four months later and he still didn't [] secure a job.

*Id*. at 29.

Third, with regard to the allegation that he refused to remove a hat, there appears no dispute that he wore the beanie hat even after he was told to remove it. Fourth, it likewise appears undisputed that he failed to pay his financial obligations. Specifically, Shrine

11

testified that Lancaster had paid none of the required monetary obligations or fees, and as of the January 3, 2012 probation violation notice, he was $1,083 in arrears; Lancaster provided no evidence to the contrary establishing or even suggesting that had paid anything.

If a defendant has violated any terms of probation, the decision to revoke probation will be affirmed. *Cox*, 706 N.E.2d at 551. Considering only the evidence most favorable to the judgment without reweighing that evidence or judging the credibility of the witnesses, we reject Lancaster's claim of fundamental error and conclude that the State presented substantial evidence of probative value to support the trial court's decision to revoke Lancaster's probation and order him to serve the remaining 1,400 days or 700 actual days in the Department of Correction.

Affirmed.

MATHIAS, J., and CRONE, J., concur.